UNITED STATES v. SABIN (No. 2452).[1]

1. EVIDENCE—PRESUMPTION—FOREIGN TAX.
     Where it is shown that a sales tax is paid at the factory where imported merchandise was made, the tax will be presumed to be included in the invoice price.

2. EVIDENCE—INVOICE AS.
     The price paid for the merchandise imported, as shown by the invoice, was some evidence of market value.

---

[1] T. D. 40731.

3. EVIDENCE—APPRAISEMENT—PRESUMPTION—DISCOUNTS.

   Where it is made to appear that the factory from which imported merchandise was purchased allowed a discount on it, and not made to appear that such' discount was not made to all purchasers at the factory, the discount should have been allowed in the appraisement.

4. EVIDENCE—WITNESS'S DEMEANOR.

   A trial court, having an opportunity to see and hear a witness, is a better judge of his credibility than an appellate court.

United States Court of Customs Appeals, March 6, 1925

APPEAL from Board of United States General Appraisers, Circular Reappraisement No. 34965

[Affirmed.]

*William W. Hoppin*, Assistant Attorney General (*J. G. Lerch*, special attorney, of counsel), for the United States.

No appearance for appellee.

[Oral argument Jan. 14, 1925, by Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

SMITH, Judge, delivered the opinion of the court:

Fruit paste, jellies and guava cream, imported at Tampa, Fla., were appraised by the local appraiser at their entered value. The collector appealed to reappraisement and the general appraiser added 1 per cent to cover "Cuban sales tax," and refused to allow the discount claimed upon entry of the merchandise. From the reappraisement of the general appraiser the importer appealed to Board 1, which sustained the entered value as the market value of the merchandise on the date of shipment, and reversed the decision of the general appraiser. From that decision the Government appealed.

On the hearing before the general appraiser the importer was not represented by counsel, but a witness in his behalf testified that quotations for the merchandise under appraisement were always the same and that there was very little difference, if any, in the prices of business houses dealing in such commodities. That witness also testified that importer was allowed a 5 per cent discount from the invoice price and an additional 3 per cent on payment for the goods within 10 days.

On its part the Government offered in evidence price lists, dated August 25, 1923, September 8, 1923, and September 15, 1923, on which appeared the following statement: "1 per cent on gross sales will be charged in addition to the value of this merchandise." An unverified report of a special agent transmitting what purported to be a copy of the Cuban sales tax law which was not certified and a report not under oath of the same special agent covering an investigation of the market value of the merchandise imported were introduced in evidence by the Government.

72052—25†—VOL 12——34

Articles X, XIII, XVI, XVII, and XIX of the purported law were as follows:

ARTICLE X. Those merchants, industrial manufacturers and other contributors to the tax of one per cent (1%) on their gross sales or receipts, may, at their discretion, if they so desire, include in their invoices, bills or whatever other document may be issued with reference to the sale, assignment or transfer of the merchandise, in the collection of their earnings, or gross receipts, the amount of the tax.

\*        \*        \*        \*        \*        \*        \*

ARTICLE XIII. The tax of one per cent (1%) on gross sales and receipts will be collected in stamps, the engraving and printing of which will be realized exclusively for account of the State and according to models to be approved by the Treasury Department, and

ARTICLE XVI. The stamps as they are received will be deposited in the General Treasury of the Republic and will be remitted by same to the administrations of the taxes and imposts of the fiscal zones and districts on requisitions previously filed in triplicate, and which will be transmitted by the section of taxes on gross sales in which will be expressed the number of stamps remitted and their value.

ARTICLE XVII. The General Treasury will remit the stamps to the administrations of taxes of the fiscal zones and districts in conformity with their requisitions and will keep the correlative numbering of same, and the administrations of taxes and imposts of the fiscal zones and districts will give exit to said stamps, guarding also order of correlative numbering of those that have been remitted by them.

ARTICLE XIX. The tax will be paid by the contributors in the administrations of the fiscal zone or district in which is established their establishment, factory, enterprise or industry, and where resides the commissioner and agents or representatives of all persons native or legal under obligations to pay this tax.

For purposes of comparison the agent set out in his report the prices paid for the merchandise by the importer and the prices quoted for similar merchandise in Habana during the corresponding period. The special agent, commenting on those prices, stated that *they might not seem to be very illuminating for the reason that the various classes of paste and preserves manufactured in Habana were not sold in uniform sized containers and for the further reason that the same unit of quantity or value was not used by all manufacturers in listing their products.*

The special agent believed, however, that the prices when compared would indicate a wide range of prices, which served to show that there was no fixed standard of value in the Habana market for the various classes of guava products and preserved fruits. The special agent therefore had recourse in his report to what he claimed to be the cost of production, and endeavored to show that that cost would amount in August, 1923, to $8.60 and in September, 1923, to $8.85 per 100 pounds for guava paste in 3-pound boxes, and that the paste could not be sold for less without loss. That conclusion, however, was not in accord with the information obtained by the special agent from the manager of the "La Goria" factory who

stated to the special agent that the price could fall as low as $7.50 without causing loss.

Accepting the uncertified law of Cuba and the report of the special agent as evidence, it can not be said that they impeach the sworn declaration of the witness for the importer who testified that there was very little difference in the prices quoted by Cuban dealers for the merchandise imported and that the importer cabled each time for prices and received a discount from such prices of 5 per cent and 3 per cent.

Moreover, it appears from the purported law of Cuba and the bookkeeping requirements prescribed thereby that the 1 per cent sales tax is collected at the source and paid by the factory by the purchase of stamps from the Government of Cuba. A tax collected at the source becomes in the ordinary course of business a part of the cost of the goods, in the absence of any showing to the contrary, and was presumably included in the invoice price of the goods here involved. In other words, the manufacturers having paid the tax, we can not assume that the tax was not incorporated in the selling price, no evidence to that effect appearing of record.

The price paid for the merchandise imported as shown by the invoice was some evidence of market value.—Lloyd Co. *v.* United States (9 Ct. Cust. Appls. 280, 283; T. D. 38217); United States *v.* Bloomingdale (10 Ct. Cust. Appls. 149–154; T. D. 38400). In the absence of evidence to the contrary, it must be presumed that the sale price of the goods included the tax paid at the source. No evidence was submitted by the Government showing or tending to show that the invoice price did not include the sales tax or that the discounts claimed were not regularly allowed. We must consequently hold that the finding of Board 1 that such discounts were allowed and that the entered value was the market value of the importations was warranted by the facts disclosed to it by the record on appeal from the decision of the single general appraiser.

The witness, Ernest Santos, testified for the Government that he was connected with the firm of Jose Franquez & Co., and that he was familiar with the market value of merchandise such as that here imported; that as agent for a *foreign shipper* he was allowed a discount from 10 to 15 per cent that was not allowed for home consumption; that the allowance made to agents was in his opinion a commission to cover advertising and propaganda and to confine "ourselves" (agents) exclusively to the sale of one manufacturer. That testimony simply means that agents were not allowed a discount on goods sold for home consumption. It does not mean that such discounts were not allowed to merchants in Cuba who purchased directly from the factory and not through agents. If, however, that testimony were open to the construction that no discount

was allowed to Cuban buyers purchasing directly from the factory, we would be unwilling to disturb the finding of the board in view of the fact that the board saw and heard the witness and was in a better position than we are to determine what he meant.

The decision of Board 1 fixing the entered value of the importations as the market value thereof and reversing the decision of the general appraiser is therefore *affirmed*.