HENRY W. PEABODY & Co. *v.* UNITED STATES

**No. 7999.—**
Entry No. 28878, etc.

Second Division, Appellate Term

(Decided May 16, 1951)

*Benjamin A. Levett* (*Benjamin A. Levett* and *Meyer Ohlbaum* of counsel) for the appellant.

*David N. Edelstein*, Assistant Attorney General (*Daniel I. Auster,* special attorney), for the appellee.

Before LAWRENCE and FORD, Judges

FORD, Judge: This application, seeking a review of the decision and judgment of the trial court, covered by the appeals listed in schedule "A," hereto attached, was filed under the provisions of title 28 U. S. C. § 2636 (a). The merchandise involved consists of safety matches imported from Finland. These matches were entered at $14 per case, less certain nondutiable items, which are not here in dispute, and were appraised under the Tariff Act of 1930, section 402, at "C. O. P. 28.0057 Finnish Marks per 1 gross boxes." In addition, in appraising the merchandise under the Antidumping Act of 1921, the appraiser found the "Unit Purchase Price (Section 203)" to be "$0.51828 per 1 gross boxes," and "Unit Cost of Production (Section 206)" to be "Finnish Marks 28.0057 per 1 gross boxes."

The above appraisements under the Antidumping Act of 1921 were made by the appraiser pursuant to a finding of dumping on Finnish matches made by the Secretary of the Treasury and reported in T. D. 44716, dated March 23, 1931.

Counsel for appellant made it clear to the trial court that his main, if not only, contention was that the appraisements herein were invalid, null, and void. In support of this contention, counsel for appellant relies upon the alleged fact that the appraiser failed to comply with the regulations in effect at the dates of these importations, or before the final appraisements were made. The ground for the claimed invalidity of these appraisements is stated in the brief of counsel for appellant before the trial court as follows:

\* \* \* It is claimed however, that the law and the regulations in effect at the time of the appraiser's returns were not complied with in that the appraiser failed to notify the importers and call them before him for questioning as to the matter.

There were ample concessions before the trial court to establish that there was not a proper designation of the packages or quantities of these matches for examination and that there was not a sufficient

examination of these matches under the provisions of section 499 of the Tariff Act of 1930, prior to its being amended by the Customs Administrative Act of 1938 (52 Stat. 1077).

In view of the amendment of section 499 of the Tariff Act of 1930 by the Customs Administrative Act of 1938, *supra*, which was prior to the appraisement of the merchandise herein, it is apparent that the lack of a proper designation and examination of the merchandise could not result in an invalid appraisement, and for this reason, apparently, counsel for appellant does not press this contention before us.

The Antidumping Act of 1921 does not specifically require the appraiser to summon the importer or his agent before him to give information relative to the matter, but it is observed that the regulations prescribed by the Secretary of the Treasury for the administration of the Antidumping Act of 1921 do require such procedure on the part of the appraiser, as will be seen from the following:

4. Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not made public a finding, the appraiser or the person acting as appraiser has reason to suspect from the invoice or other papers, or from information presented to him, that the purchase price is less, or that the exporter's sales price is less, or likely to be less than the foreign market value (or in the absence of such value, than the cost of the production), he shall immediately request the importer or his authorized agent to appear before him in order that he may obtain whatever information the importer or his agent may have relative to the matter. [Regulations for the enforcement of the Antidumping Act of May 27, 1921, dated June 15, 1922, T. D. 39165.]

(b) When the appraiser has reason to believe or suspect that merchandise is imported in violation of the antidumping act, he shall immediately request the importer thereof or his authorized agent to appear before him in order that he may obtain whatever information the importer or his agent may have relative to the matter. [Article 790 (b), Customs Regulations, 1937.]

In *Vulcan Match Co., Inc.* v. *United States*, 5 Cust. Ct. 188, C. D. 398, in holding subsection (b), quoted above, to be mandatory, this court said:

While in form the requirements of the quoted portions of articles 792 and 796 appear to be concerned solely with the acquisition of information by the appraiser upon which his appraisement and report will be based, nevertheless, it cannot be denied that if complied with they confer upon the importer a substantial right to the protection of his property, viz, that of furnishing information to the appraiser upon the basis of which a determination of the status of his merchandise depends. For this reason we are satisfied that the regulations are mandatory in character and that compliance therewith is a condition precedent to a valid appraisement under the antidumping act. Such regulations have the force and effect of law.

The above holding finds ample support in *French* v. *Edwards*, 13 Wall. 506, 20 L. ed. 702, from which the following is quoted:

There are, undoubtedly, many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such, generally, are regulations designed to secure order, system and dispatch in pro-

ceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated. But when the requisitions prescribed are intended for the protection of the citizen, and to prevent a sacrifice of his property, and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory. They must be followed or the acts done will be invalid. The power of the officer in all such cases is limited by the manner and conditions prescribed for its exercise.

Since the only contention relied upon by counsel for appellant is that the appraisements are void because the appraiser failed to comply with the regulations governing the present importations, we shall examine the record carefully to ascertain whether the same establishes a *prima facie* case for the appellant herein on this point.

At the trial Frank L. Cusack testified that he had been employed by appellant herein for 13 years prior to 1932 when appellant went out of business; that for 8 years prior to 1932, he held the position of import traffic manager; that he had complete charge of that work.

Q. Referring to these importations, will you state whether, at the time of importation, or thereafter, you had any conference at all with the Appraiser or the Examiners, or anyone connected with the Appraising Department, or the Collector's Department in regard to these matches?—A. I do not recall any such incident.

Q. If there had been any call upon your office for a conference with the Appraiser, or other officers, would that have come to you?—A. Yes, it would.

Q. And can you recall ever receiving any such notice or request—A. No, I don't.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Would you personally be informed of any conversations anyone in the Customs service would have with either of those gentlemen? [Reference being made to Mr. Brian and Mr. Lincoln, members of the firm.]—A. I am very sure I would.

X Q. By whom?—A. By one of those gentlemen, if anybody in the Customs service had any conversations with them, I think they would have informed me.

X Q. Suppose they had a conversation as to prices, as to sales, as to purchases, would they inform you of that?—A. I think they would.

X Q. Would that be within the scope of your duties as Import Traffic Manager?—A. I think they would notify me of any conversations they had with any Customs officials.

The witness admitted that he did not know until it was called to his attention by counsel for the Government that Mr. Brian and Mr. Lincoln had signed nonexporter's affidavits.

Arthur F. Barlow testified for appellant that he was employed by it as accountant in the import division from 1919 until 1932; that from an accounting standpoint, he was familiar with the importation of the matches here involved.

Q. Will you state if, at any time while you were employed with Peabody, either before liquidation or since, you have had any conferences with any Government officials in connection with these shipments?—A. No, sir, I have not.

Frederick W. Lincoln testified that he was a partner in the firm of Henry W. Peabody & Co. from 1925 to the time of liquidation of the firm in 1932; that he was familiar with the importation of the matches here involved; that all the details in connection with the importation of these matches were in charge of Frank Cusack.

Q. Will you state whether, as a partner, you were ever called upon to appear before any Government officials in connection with this shipment?—A. I was not.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Can you state whether or not he [Mr. Brian] was ever called before the United States Customs——A. To the best of my knowledge he was never called.

Q. On what do you base that?—A. Well, if he had been called, I think I saw him every day, and we were in business together, and I feel sure, although it was many years ago, that if he had been called, he would have mentioned it to me.

When, on cross-examination, the witness was questioned regarding the probability of any of the other partners being called for a conference by the appraiser, the witness stated:

A. Very improbable. It is possible but improbable because they were the older partners. They were well in their 70's at that time, and it is unlikely that they would have been the partners that would have been selected. Probably it would have been either Mr. Brian, Mr. Cusack, or myself, but more likely it would have been Mr. Cusack who would have been selected to go on a matter of that sort.

X Q. Well, Mr. Cusack had nothing to do with purchases or sales of this merchandise, did he?—A. No, but he had something to do with anything that had to do with the importation, the handling of documents he had to do with, and that came under his job as part of Traffic Manager, and we were importing numerous things, and no one man just had one job.

William V. Bunting, the United States examiner of matches during the period here involved, testified for appellee herein as to his practice with respect to a suspicion of dumping in connection with matches that:

The practice was following the regulations to summon the importer or someone representing him to our office for a consultation to see his records. That was the universal—that was our practice, and I believe it must have been followed in this case. I have not, however, any specific recollection of having seen any of the people from Peabody. It is 16 years ago, and I can't remember specifically any individual instance.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. And you don't recall seeing any of the gentlemen who testified this morning, do you?—A. I remember having seen Mr. Lincoln, but I couldn't specifically say that I had him in my office on this particular matter.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Do you recall any conversation with anyone representing the importer asking him to have these papers signed? [Nonexporter's affidavits.]—A. I have no specific recollection of anyone from this firm talking about this, \* \* \*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Do you know the other gentleman who signed those reports, Non-Exporters Affidavits, Mr. Brian? Do you know him?—A. I do not.

Q. So you have no recollection as to anyone to whom you handed these papers, is that correct?—A. That is correct.

We are not unmindful of the fact that in cases such as this it is the duty of the importer to establish by the weight of credible evidence that the value found by the appraiser is not the correct value, and also that some lower value claimed by it is the correct value of the merchandise. Just how the importer will proceed with this twofold burden is a matter largely up to the individual importer. In the instant case, the importer has elected to attack the correctness of the appraised value by showing that the appraisement was null and void, and to rely upon the "evidence in the entry record and that adduced at the hearing" (Customs Administrative Act of 1938, *supra*), to establish the lower value contended for by it. In this case, the only evidence we have as to a value for the merchandise different from that found by the appraiser is the "evidence in the entry record," there being no evidence on this point "adduced at the hearing."

The trial court was of opinion that appellant had not disproved the correctness of the value found by the appraiser, as appears from the following from its opinion:

I am of the opinion that the evidence offered on behalf of the plaintiff is not sufficient to overcome the presumption of the due performance of their duties by public officers. *Knauth, Nachod & Kuhne* v. *United States*, 13 Ct. Cust. Appls. 324, T. D. 41234. The plaintiff has not offered sufficient evidentiary facts establishing directly or by reasonable inference any ultimate fact inconsistent with the presumption that the appraiser would not omit anything which his official duty required to be done.

It is our view that the weight of the evidence offered at the trial of this case establishes that the appraiser did not comply with the regulations hereinbefore set out by requesting "the importer thereof or his authorized agent to appear before him in order that he may obtain whatever information the importer or his agent may have relative to the matter."

Appellant's witness, Frank L. Cusack, the import traffic manager of appellant, testified that he was in complete charge of that work, which undoubtedly refers to the importation of merchandise by appellant, including the matches here involved; that he had no recollection of having had any conference with the appraiser or examiner, or anyone connected with the appraiser's department, or the collector's department in regard to these matches. He also testified that if any request for such a conference had been received by his firm, it would have come to him. He further testified that he did not recall receiving any such notice or request, and that he was very sure that he, personally, would have been informed of any conversations anyone in the customs service would have had with either Mr. Brian or Mr. Lincoln, members of the firm. "* * * if anybody in the

Customs service had any conversations with them, I think they would have informed me." None of this testimony is denied or in any way contradicted.

Mr. Lincoln, a member of the firm, gave positive testimony that he had never been called by the appraiser for a conference on these matches, as required by the regulations, and that to the best of his knowledge none of the other members of the firm were requested by the appraiser to appear for a conference on these matches, and gave very sound reasons for such belief.

While it is true that Mr. Bunting, the examiner of matches at the port of New York at the time of these importations, testified that it was "our practice, and I believe it must have been followed in this case," to follow the regulations, he also testified that he did not remember having seen any of the people from Peabody.

Between the dates of the entries and the appraisements, the examiner, Mr. Bunting, had retired from active service. At the dates of the entries two of the general partners of appellant "* * * were well in their 70's * * *," which perhaps explains why they were not called to testify at the trial, and one of the partners had died in the meantime.

With reference to the value of the presumption of correctness attaching to the acts of Government officials, our appellate court in *United States* v. *Ignaz Strauss & Co., Inc.*, 37 C. C. P. A. (Customs) 48, C. A. D. 418, said:

The trial court properly held that the presumption of correctness attaching to the collector's classification of merchandise is not to be regarded as having evidentiary value so that the presumption may be weighed against the evidence of the party challenging the validity of the classification. *Morse Bros. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 553, T. D. 41432; *Marshall Field & Co.* v. *United States*, 20 C. C. P. A. (Customs) 225, T. D. 46037. Moreover, findings of fact made by the Customs Court will not be disturbed on appeal unless such findings are clearly contrary to the weight of the evidence. *United States* v. *Flexideal Dry Mat Co.*, 23 C. C. P. A. (Customs) 270, 275, T. D. 48113.

In *Marshall Field & Co.* v. *United States*, 20 C. C. P. A. (Customs) 225, T. D. 46037, our appellate court also held:

It has been announced as the rule of law by this court that the presumption of correctness attaching to the classification of the collector can not be regarded as having evidentiary value and can not be weighed against the evidence produced on the trial. * * *

When this record is considered in the light of the authorities cited and quoted, it is our opinion that the weight of the evidence required a holding that the appraiser did not request the importer or its authorized agent to appear before him in order that he might obtain whatever information the importer or its agent may have had relative to this matter, as required by the regulations in effect at that time.

Following the authorities heretofore quoted and cited, we hold the appraisement in each of the involved appeals to be null and void.

Since the appraisement in each of these appeals was made after the effective date of the Customs Administrative Act of 1938, *supra*, the procedure to be followed here is to be governed by the provisions of said act. Section 16 (b) thereof provides in part:

\* \* \* Every such appeal shall be transmitted with the entry and the accompanying papers by the collector to the *United States Customs Court* and shall be assigned to one of the judges, who *shall* in every case, notwithstanding that the original appraisement may for any reason be held invalid or void and that the merchandise or samples thereof be not available for examination, after affording the parties an opportunity to be heard on the merits, *determine the value of the merchandise from the evidence in the entry record and that adduced at the hearing.* [Italics ours.]

There being no evidence of the value of the involved merchandise before us other than the "evidence in the entry record," and being required by statute to find a value for this merchandise upon that evidence, we are faced with a situation very similar to that involved in *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 C. C. P. A. (Customs) 150, C. A. D. 227, wherein our appellate court stated:

This court has held that under certain circumstances the invoice may be considered to be some evidence. *United States* v. *Bloomingdale Bros. & Co.*, 10 Ct. Cust. Appls. 149, T. D. 38400; *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, T. D. 40731; *Union Food Products Co.* v. *United States*, 13 Ct. Cust. Appls. 343, T. D. 41253. In the instant case the invoices are the only evidence of the quantity of whisky imported. In the case of *United States* v. *International Clearance Co.*, 12 Ct. Cust. Appls. 430, T. D. 40592, this court held that since the weight of cattle there involved was not ascertained by customs officials upon arrival the duty was properly assessable on the weight of the cattle as shown by the invoice.

Since the action of the customs officials in purporting to gauge the involved merchandise is null and void for the reasons hereinbefore stated and since official gaugers appear to be the only persons who may legally make a gauge of whisky for customs purposes, it necessarily follows that based on the evidence of the invoices the imported whisky is properly assessable for duty upon the amounts set out therein.

In denying a motion for rehearing in the above case, the court said:

\* \* \* While it should not be necessary so to state, nevertheless we deem it proper to mention that under certain circumstances it has been judicially held by this court that the invoice is some evidence. The presumption of correctness attaching to the collector's action having been overcome without consideration of the invoice as evidence against the presumption, said invoice was the only evidence before us as to the quantity of liquor imported.

The petition for rehearing is *denied*. [Italics quoted.]

Since the action of the appraiser in purporting to appraise the involved matches is null and void for the reasons hereinbefore stated,

and since the appraiser appears to be the only person who could legally appraise these matches for customs purposes, it necessarily follows that based on the evidence of the invoices and entry papers, this being the only evidence before us as to the value of the merchandise, the value shown thereon must be accepted by us as the correct value of the involved matches. While we recognize the limitation placed upon invoices as evidence by our appellate court in the *Seagram* case, *supra*, yet here as there, the only evidence before us is the evidence in the entry record, and being required by the statute to determine the value of the merchandise from the evidence in the entry record, there being no evidence as to value adduced at the hearing, it necessarily follows that the invoiced and entered value constitutes the proper value of the involved merchandise, and we so hold.

Based upon a consideration of the record before us, we find as facts:

1. That the involved merchandise consists of matches imported from Finland and entered at the port of New York.

2. That as to said matches the appraiser made a report of dumping under the Antidumping Act of 1921.

3. That at the trial of these appeals appellant offered evidence to show that the appraiser did not comply with the regulations promulgated pursuant to the provisions of the Antidumping Act of 1921.

4. That the appellant herein did not offer any evidence as to the value of the merchandise, except the papers connected with the files of the court.

We conclude as matter of law:

1. That the regulations promulgated pursuant to the provisions of the Antidumping Act of 1921 requiring the appraiser to request the importer or its authorized agent to appear before him in order that he may obtain whatever information the importer or its agent may have relative to the matter, are mandatory.

2. That the weight of the evidence establishes that the appraiser failed to comply with the aforesaid regulations.

3. That the appraisement in each appeal is therefore null and void.

4. That the entry record, comprising, among other things, the invoices and entry papers, being the only evidence before us as to the value of the merchandise, the values shown thereon must be, and are hereby, held to be the proper value of the involved merchandise.

The decision and judgment of the trial court are accordingly reversed. Judgment will be rendered accordingly.