H. S. Dorf & Co., Inc., a./c. Joseph H. Meyer Bros. *v.* United States (No. 4788)[1]

United States Court of Customs and Patent Appeals, February 3, 1954

*Mary Rehan* for appellant.

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *Daniel I. Auster*, special attorneys, of counsel), for the United States.

[Oral argument December 9, 1953, by Miss Rehan and Mr. Auster]

Before Garrett, Chief Judge, and O'Connell, Johnson, Worley, and Cole, Associate Judges

O'Connell, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, rendered in a reappraisement proceeding, A. R. D. 28, reversing the judgment of the single judge, Reap. Dec. 8084.

The question presented involves the proper basis for the evaluation of 25 cases of white cornaline glass rods manufactured in, and shipped

---

[1] C. A. D. 548.

from, France to be used in making "pearl" beads. The goods were entered for consumption on that basis at the port of New York, but were there advanced in value by the appraiser on the ground that the merchandise had been exported from Mexico and not from France.

The record consists of the testimony of Edward Kampa, employed for 22 years as purchasing agent and general manager for the firm and factory of Joseph H. Meyer Bros., Brooklyn, hereinafter called Meyer, together with defendant's Exhibit 1, a letter from the French shipper, and Collective Exhibit 2, the report of a customs agent, offered in evidence by the Government and admitted without objection.

The issue in the case at bar concerns no conflict in the facts presented, but the legal significance of the transactions which those facts establish.

The Government's exhibits and Kampa's testimony establish that in April of 1946, Meyer, a manufacturer of, or dealer in, "Richelieu" pearls, etc., was "anxious to get" from France 50 cases of glass of a special type to be used in the manufacture of beads, and accordingly placed an order therefor by cable, which order was addressed to Union des Industries du Verre pour l'Exportation, Paris, hereinafter called Univer, the French shipper of the instant merchandise. The order read as follows:

Ship Industria de Cristal Plastico s A COYOACAN D F MEXICO CORNALINE CANE GLASS 2000 kilos 5 millimeters 2000 kilos 6 millimeters 1000 kilos 7 millimeters we will forward payment. Cable definite amount and approximate shipping date

The order thus placed with Univer for the 5,000 kilos of cornaline cane glass was accepted by that firm at a quoted and invoiced price of 60 cents per kilo; Meyer to provide the insurance, and Guilbert-Martin, the manufacturer of the merchandise, being instructed to forward its *pro forma* [1] invoice therefor.

The goods were accordingly shipped from France in May or June of 1946 consigned to Industria de Cristal Plastico, S. A., hereinafter called Cristal, Coyoacan, Mexico, "with the intention that the glass rods were to be used by the latter in the manufacture of glass beads for Meyer Bros. account in place of American glass which had previously been supplied by Meyer Bros."

Meyer instructed the French shipper to forward the rods to Cristal, via New York, where Meyer was to trans-ship them to Mexico by the first available steamer. There were no direct shipping facilities at that time between Paris and Mexico.

When the goods arrived and were unloaded at New York, Cristal,

---

[1] Use of *pro forma* invoices permitted customs entry and clearance of goods subject to later production of the certified invoice. *Customs Valuation in the United States* by R. Elberton Smith, 1948, pages 121, 124–125, 129.

in Mexico, was "very anxious to get some glass in a hurry," and 25 cases were accordingly forwarded by Meyer from New York to Mexico by rail via Laredo, Texas.

Meyer thereafter retained H. S. Dorf & Co., Inc., of New York to trans-ship from there to Mexico the remaining 25 cases of the rods, which in the meantime, and for some time, had been kept in bond at New York in a Government warehouse. Dorf of New York procured space in a boat and shipped the 25 cases in issue to Vera Cruz, Mexico, consigned to its agent there, Dorf of Mexico, for delivery to Cristal at Coyoacan.

While the goods were thus enroute by steamer to Mexico, Meyer got word from Cristal that the 25 cases of rods previously forwarded by rail were unsatisfactory for their intended purpose, since Cristal was not used to working that particular type of glass. To avoid further trouble there, Cristal requested Meyer to "take back" the 25 remaining cases of the rods then in transit to Cristal. Meyer thereupon notified Dorf of New York to have the goods immediately returned, but they were "held up for quite some time, [at Vera Cruz] possibly waiting for a steamer to come back." Hence, the goods never came under the supervision or into the possession of Cristal either at Vera Cruz or at Coyoacan, nor were they available to Cristal at Vera Cruz without further negotiations with Meyer of Brooklyn.

The following excerpt from the record involving the testimony of Edward Kampa, certain questions by Chief Judge Oliver, Miss Rehan, counsel for the importer, and Mr. Bibando, Government counsel, and the responses thereto, discloses the precise nature of the evidence submitted relative to the issue to be determined:

Direct Examination of Edward Kampa by Miss Rehan:

Q. When the merchandise was down there, was it opened or not? A. It wasn't opened.

Q. It came back to you in the same condition as it had left this Country? A. In the original cases that had been shipped.

Q. It was not opened? A. No.

Q. In the meantime, while it was there, did you send through your office any instructions to the Dorf Company here to send on to their company to deliver these to your clients in Mexico? A. We received word from Mexico after quite a lot of time had elapsed that they were desperately in need of glass. It seems that the manufacturers in this country weren't able to provide glass in sufficient quantities to supply the needs of manufacturers in this country, let alone give this excess glass which could have been shipped out of the country to somebody else. The manufacturer in Mexico in the meantime had exhausted his supply of glass because of the emergency that existed, and wasn't able to get any replacements, so they notified us they were so desperately in need of glass they would accept it and use it in the emergency until they were able to get more suitable glass.

Q. Then you asked your broker to deliver? A. Yes.

Q. Did they ever deliver it? A. They didn't deliver it.

Q. Do you know why they didn't? A. Yes.

Q. Why? A. The glass had left Mexico on a steamer for the United States.

Q. When they received this message that they were to deliver it, it was no longer in Mexico? A. That is right.

Q. It was never opened, and before they had time to carry out an order to have it delivered, it had already returned to this country and wasn't there? A. That is right.

Miss Rehan: Your witness.

Chief Judge Oliver: What happened when it got to New York?

Miss Rehan: It was assessed with duty, and—

Chief Judge Oliver: Was it entered in New York?

The Witness: Yes, it was. Duty was paid and it was delivered to our factory in Brooklyn.

Chief Judge Oliver: It entered the commerce of the United States and was sold in the ordinary course of business?

The Witness: Yes.

Chief Judge Oliver: At what price did you enter these?

Miss Rehan: It was entered in American dollars at 60 cents per kilo, and it was appraised at American dollars .8652 per kilo, net packed.

Chief Judge Oliver: Was the entered value predicated upon any invoice received from anyone?

Miss Rehan: Yes.

Chief Judge Oliver: Who was that billed to you by?

The Witness: By Guilbert-Martin, Paris, France.

Chief Judge Oliver: Is that invoice among the papers here?

Miss Rehan: It is a pro forma invoice.

Chief Judge Oliver: No consular invoice?

Miss Rehan: No.

Chief Judge Oliver: Now we have the merchandise back from Mexico, entered in the commerce of the United States, and entered at the value represented by the French exporter's pro forma invoice which is with the papers?

Miss Rehan: That is correct.

Chief Judge Oliver: And then the value was advanced by the appraiser at the port of New York?

Miss Rehan: Yes.

Chief Judge Oliver: And is there any information in that advance showing the basis of his appraisement, his advance?

Miss Rehan: The only thing we know is he says it is the proper price in Mexico.

Chief Judge Oliver: Is the court correct in its understanding that the basis for the advance in value is a Mexican foreign value?

Mr. Ribaudo: No, sir.

Chief Judge Oliver: Mexican cost of production?

Mr. Ribaudo: Yes.

Chief Judge Oliver: Is there any dispute that if it is found that the proper basis for value is the French exporter's invoice value, is there any question but that price at which it was entered and billed is the foreign value for this merchandise in France?

Mr. Ribaudo: At this time the Government feels it is not at liberty to stipulate the foreign value in France.

Chief Judge Oliver: That is perfectly all right.

The record establishes further that prior to the return of the merchandise to New York, Dorf of Mexico had applied there to the

Mexican Government, and received permission from it, to return the goods to Meyer, the rods never having been entered in Mexico for consumption or appraisement.

When the shipment came back to New York, Meyer was "flabbergasted" and required an explanation. That was contained in a letter of April 10, 1947, from Dorf of Mexico describing what had there happened to the goods. The letter is relied upon by the Government and is thus emphasized and set forth in its brief on appeal:

With reference to this matter we must inform you that in spite of having been advised by Dorf, New York, that the above cases should continue to their destination, we could not accept the orders in question, due to the fact that the necessary request to return or re-ship them had already been submitted to Customs here, as unusable merchandise which had been sent to Vera Cruz in error (they did not leave this port on the first shipment).

Our request had already gone to the head office of Customs in Mexico, D. F., with the corresponding report and it was not possible to revoke the step taken by Customs. Therefore, we had to proceed with the return as per our request, since we had requested therein exemption from payment of duties by reason of its being merchandise in bad order.

*Please also be advised that as it was not declared as rods, they would impose a fine of five times the invoiced value.*

In view of all the above, you will understand that *we had no recourse but to reexport it, advising* Dorf, New York, of the re-shipment under date of November 20, 1946. (Italics supplied.)

The difference in language or the brevity of cabled instructions may have possibly resulted in a misunderstanding at Vera Cruz as to why the goods were not acceptable to the Mexican consignee at Coyoacan. Moreover, Miss Rehan, counsel for appellant, made the request which resulted in the investigation by the inspector, whose report is contained in the collection of documents, Government's Exhibit 2. An intent to defraud the revenues of either the United States or Mexico was nowise inferred by the Customs Court from the uncalled for misrepresentation in the application made by Dorf at Vera Cruz.

The weight of the evidence clearly indicates that Meyer assumed a proprietary interest in the transactions at bar and not only billed Cristal at 60 cents per kilo for all the goods forwarded to Mexico; but gave Cristal a credit at that rate for the first 25 cases of the rods "processed" there by Cristal.

The trial judge, in view of the evidence hereinbefore described, held that the shipment of merchandise in issue must be considered as an exportation thereof from France, and not from Mexico; that a determination of value of the imported merchandise must be based on its value in France; and that such value is the entered value, for the stated reason:

The only evidence in this record bearing on a valuation in France for this merchandise is contained in the invoice and entry, the *bona fides* of which has not been attacked.

The trial judge in support of his position cited and relied upon the rule enunciated in Reap. Dec. 26133, defined in Reap. Circulars Nos. 2809 and 2810, November 1, 1915, which, so far as pertinent, reads as follows:

Reappraisement 26133—Paper.—From Keuffel & Esser, Montreal. Exported July 1, 1915. Entered at New York July 31, 1915. File No. 83112. Entry 15171.

Issue.—This paper was ordered by a New York house to be shipped from Switzerland to its Canadian house in Montreal. On June 16, 1915, while in transit and about one month before the paper had arrived in Canada, the agent in charge of the Canadian branch was notified to immediately forward the same to the warehouse of the purchasers in Hoboken, N. J. The letter containing these instructions was accompanied by the original invoices intended for Canadian entry. The paper was entered for export on July 17, 1915, in compliance with Canadian law, and immediately exported on that date to this country. The paper never entered into the commerce of Canada, and is accordingly to be regarded as a shipment from Switzerland. The invoice price of 120 francs per 100 kilos being admittedly Swiss value, the same is sustained.

On appeal from the judgment authorized by the trial judge in accordance with the conclusion hereinbefore expressed, the Appellate Division held that, as a matter of law, the rods were exported from Mexico, and not from France; and since there was no evidence in the record tending to show a value in Mexico at the time of such exportation different from that fixed by the appraiser on the second arrival of the goods at the port of New York, namely, "a Mexican cost of production," the judgment of the trial court must be overruled and the action of the appraiser sustained.

Numerous cases and excerpts therefrom were cited in support of its action by the Appellate Division. The predominant view which controlled its final conclusion was there italicized and quoted as follows:

So long as an immediate bona fide purpose to seek a foreign market coincides with a bona fide act of shipment later changes in either the intent or destination have no effect upon the original character of the act as an exportation. (Italics quoted.)

In none of the citations relied upon by the Appellate Division is the factual situation or the principles of law expounded therein on all fours with the facts and points of law involved in the case at bar. Had the goods been entered for consumption by Meyer when they arrived at New York from France in the first instance, according to the reasoning of the Appellate Division, the goods would have been properly advanced in value by the appraiser on the ground that, as a matter of law, the rods had been exported from Mexico.

The trial judge sitting in reappraisement did not define the legal relationship which existed between Meyer and Cristal, either as a subsidiary or an agent of Meyer. The conclusion is inescapable, however, that a close and cordial bond existed between those two firms

and was recognized and relied upon by the trial judge. Every request made by Cristal concerning the disposition of the goods was immediately complied with by Meyer, and Meyer sent the secretary of the firm, Miss Shulman, to Mexico to assist Cristal in trying to iron out the difficulty Cristal encountered in processing the only shipment of the rods which Cristal received.

The trial judge was clearly supported by the weight of evidence in his holding that the cases of rods in issue were exported from France; that they were subject in transit to the disposition of Meyer, the owner of record; that the determination of the dutiable value thereof is properly based on the value of the rods in France; and that the valuation based upon a Mexican cost of production, as assessed by the appraiser, is predicated upon a wrong theory of law, since the rods in question never entered into the commerce of that country. In other words, this court is not authorized to controvert the holdings thus made in accordance with the weight of evidence, as determined by the trial judge.

Section 2637 of the United States Code provides that the jurisdiction of this court in appeals relating to the reappraisement of merchandise shall be confined solely to questions of law. *Kenneth Kittleson* v. *United States,* 40 C. C. P. A. (Customs) 85, C. A. D. 502. Moreover, the predominant question of law to be determined here in all such cases is whether any substantial evidence exists in the record to support the controlling findings of fact relied upon by the judge or judges of the Customs Court. *United States* v. *Semon Bache & Co.,* 27 C. C. P. A. (Customs) 89, C. A. D. 67; *Brooks Paper Company* v. *United States,* 40 C. C. P. A. (Customs) 38, C. A. D. 495; *United States* v. *Henry W. Peabody & Co.,* 40 C. C. P. A. (Customs) 59, 65–66, C. A. D. 498.

Government counsel vigorously assert that in the case at bar the judgment of the Appellate Division must be affirmed, however, because the trial court in fixing the foreign value of the goods improperly relied upon the purchase price of 60 cents per kilo indicated in the exporters *pro forma* invoice which was received with the papers from France and filed by appellant when the goods were entered for consumption at the port of New York. This point was not discussed on the merits in the decision of the Appellate Division or in the brief of counsel for appellant.

Under the law, it was incumbent upon appellant in challenging the validity of the appraised value of the imported merchandise to comply with the two-fold burden fixed by the Tariff Act of 1930 and the long line of consistent judicial interpretations of the provisions thereof; namely, to produce competent evidence sufficient not only to overcome the presumption of correctness legally attaching to the valuation made by the appraiser but also to establish affirmatively the proper

and different value upon which appellant relied as a ground of recovery. *Kittleson* v. *United States, supra,* and authorities therein cited; *Golding Bros. Co., Inc.* v. *United States,* 21 C. C. P. A. (Customs) 395, T. D. 46926.

The rights of the parties to agree upon and stipulate concerning ultimate facts or essential elements required to be established in customs litigation is well recognized by federal courts. See *Pacific Trading Co.* v. *United States,* 19 C. C. P. A. (Customs) 361, T. D. 45508; *North American Mercantile Co.* v. *United States,* 18 C. C. P. A. (Customs) 74, T. D. 44030; *Brooks Paper Co.* v. *United States, supra,* footnote at page 47; *United States* v. *Fisher Scientific Company,* 40 C. C. P. A. (Customs) 164, C. A. D. 513. Such a stipulation or admission by the Government, that the foreign value of the imported merchandise was the same as the invoice price and entry, was relied upon by the importer and accepted by the trial court in Reappraisement Decision 26133 hereinbefore cited.

Under the judicial interpretation of the provisions of early tariff acts, no presumption of correctness in reappraisement proceedings attached to the appraisement of the merchandise by the local appraiser, and the price paid by the importer, as shown by the invoices, was competent evidence of market value, and might well have been accepted by the appraiser on that basis. *Lloyd Co.* v. *United States,* 9 Ct. Cust. Appls. 280, T. D. 38217.

Undiscredited and unimpeached invoice prices were likewise accepted under the tariff act of 1913. *United States* v. *Bloomingdale Bros. & Co.,* 10 Ct. Cust. Appls. 149, T. D. 38400. Proof of the payment of the invoice price of imported goods under the Tariff Act of 1922 constituted competent, relative testimony of a substantial character and of sufficient probative force to overcome any presumption of correctness attending the finding of value returned by the appraiser. *United States* v. *Glendinning, McLeish & Co., Inc.,* 12 Ct. Cust. Appls. 222, T. D. 40229; *United States* v. *Sabin,* 12 Ct. Cust. Appls. 520, T. D. 40731.

The rules of evidence defined by the enumerated cases hereinbefore described were deprived of their controlling significance, however, through the enactment of the repealing or amendatory provisions of the Act of 1930. *Golding Bros. Co., Inc.* v. *United States, supra; Stone & Downer Co.* v. *United States,* 21 C. C. P. A. (Customs) 479, 486, T. D. 46958; *Kenneth Kittleson* v. *United States, supra.*

There was no admission or stipulation by the Government in the case at bar relative to the foreign value of the merchandise. The Government accordingly argues that the trial court proceeded upon a wrong theory of law in determining that the price contained in the invoice and entry, "the *bona fides* of which has not been attacked,"

was a proper basis upon which to appraise the foreign value of the goods.

Counsel for appellant has also asserted here that the Appellate Division proceeded upon a wrong theory of law in determining the value of the goods as the Mexican cost of production, for the alleged reason that no such merchandise is produced in Mexico and customers therefor are required to apply to French manufacturers to obtain the same.

Section 518 of the Act of 1930, so far as pertinent provides with respect to appeals to reappraisement, that "A division of the court deciding a case or a single judge deciding an appeal for a reappraisement may, upon the motion of either party made within thirty days next after such decision, grant a rehearing or retrial of such case when in the opinion of such division or single judge the ends of justice so require."

Neither party to these proceedings took advantage of the remedy thus provided by the statute. Therefore the judgment of the Appellate Division, with respect to the valuation of the goods on the basis of the Mexican cost of production, must be *affirmed*.[3]

WORLEY, J., took no part in the decision.

---

[3] This court in the case of *United States* v. *Fisher Scientific Company*, 40 C. C. P. A. (Customs) 164, 170, C. A. D. 513, pointed out that since an appeal is taken from the judgment and not the opinion of the court below, the judgment may be affirmed although the opinion upon which the judgment is based contains an erroneous statement of law, citing *National Sanitary Rag Co. v. United States*, 23 C. C. P. A. (Customs) 200, T. D. 48051.

