UNITED STATES *v.* BAAR & BEARDS, INC. (No. 4969) [1]

---
[1] C. A. D. 705.

 93

United States Court of Customs and Patent Appeals, March 16, 1959

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Daniel I. Auster*, trial attorney, of counsel), for the United States.

*Sharretts, Paley & Carter* (*Joseph F. Donohue* and *W. R. Johnson* of counsel) for appellee.

Before WORLEY, Acting Chief Judge, and RICH and MARTIN, Associate Judges

WORLEY, Acting Chief Judge, delivered the opinion of the court:

The basic issue in this appeal, a reappraisement proceeding, is whether there is substantial evidence to support the judgment of the Customs Court, Third Division, appellate term, one judge dissenting, A.R.D. 85, sustaining the decision of a single judge sitting in reappraisement. If so, the judgment should be affirmed; if not, it should be reversed. *Kobe Import Co.* v. *United States*, 42 CCPA 194, CAD 593.

The importations consist of two shipments of scarves from Yokohama, Japan, the first, exported April 16, 1953, was invoiced at $3.10, entered at $2.83, claimed by the importer at $2.85, but appraised at $2.99; the second, exported April 25, 1953, was invoiced at $2.99, entered at $2.85, claimed by the importer at $2.87, but appraised at

$2.99, all the foregoing values being per dozen scarves, net, packed, f.o.b. Yokohama.

It is agreed the proper basis for appraisal is export value as defined in section 402(d) of the Tariff Act of 1930:

(d) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and covering of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

It is also agreed that the factual issue to be determined is the price, at the time of exportation, at which merchandise such as or similar to that at bar was freely offered for sale to all purchasers in the principal markets of Japan for export to the United States, within the meaning of the above language.

 It is too well established to require citation that if the action of a collector, or, as in this case, an appraiser, is challenged, the importer thereupon assumes the dual obligation of proving the challenged action wrong, and the importer's contentions correct.

In attempting to discharge the first part of that burden the importer introduced in evidence the affidavit of one Tatsuo Nishiwaki, manager of Z. Horikoshi & Co., Ltd. of Yokohama, Japan, which sold part of the instant merchandise to appellee. The pertinent parts read:

3. On or about July, 1951, the Ministry of International Trade and Industry, commonly known as "MITI", an agency of the Japanese government having jurisdiction over the issuance of export licenses for the exportation of silk scarves from Japan, began a survey of the Japanese scarf industry for the announced purpose of discovering ways and means for the economic stabilization of the Japanese silk scarf industry. The Japanese Scarf Manufacturers Association and MITI officials held a great many meetings and every manufacturer submitted cost of production statements for each of the styles of scarves that it manufactured. On or about September 1951 MITI began to refuse to issue export licenses for shipments of silk scarves that had been sold at a price lower than MITI considered to be the median cost of production of that item in the industry. There was never any publication of prices that MITI considered to be the lowest prices at which the product should be sold, but the approximate amount of the price (which had become known as the "check price") can be and was determined by submitting a series of invoices covering the same article in connection with the application for an export license. For instance, if an export license application covering silk scarves of a specific size, quality and print is denied when the selling price was shown to be $2.75 per dozen or $2.78 per dozen, but is granted when the price was $2.80 per dozen, I know that the "check price" is either $2.79 or $2.80, but *the "check price" has no relationship whatsoever to the price at which the merchandise was freely offered for sale and was sold.* During the period from September 1951 to date, actual market prices have often been lower than "check prices". (Italics supplied by the Customs Court.)

4. On or about April 3, 1953 I sold 101½ dozen 4 momme Habutae Solid colored scarves with handrolled hems, 33¼'' by 35¼'', Grade A to Baar & Beards, Inc. of New York City at $3.10 per dozen, F.O.B. Yokohama. My company exported these scarves to the United States in a case marked H.E. 2063 laden aboard the S.S. Surabaya Maru which sailed from Japan on April 16, 1953. *On April 16, 1953 silk scarves identical with those shipped were freely offered for sale and were sold to all persons in Tokyo, Yokohama and Kobe, the principal markets of Japan for the sale of such merchandise for exportation to the United States at $2.85 per dozen F.O.B. Yokohama,* and the price did not vary by reason of the quantity purchased. Said price of $2.85 per dozen included the cost of all containers and coverings of whatever nature, and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. To the best of my knowledge and belief, the "check price" on April 16, 1953 for these scarves was $2.99 per dozen, F.O.B. Yokohama, but all offers of sale and sales of identical merchandise and of merchandise substantially similar in quality and weight of material, quality of workmanship, dyed in the same or similar colors and produced or manufactured at about the same cost of production on that date (April 16, 1953) were sales or offers for exportation to the United States at $2.85 per dozen, F.O.B. Yokohama * * *. (Italics supplied by the Customs Court.)

The above affidavit, admissible under 28 U.S.C. 2633, constitutes the sole evidence offered by the importer to rebut the presumed correctness of the appraiser's action. After submitting the affidavit the importer rested. The Government then submitted seven reports of official investigations conducted in Japan, including statements as to export practices, and prices at which certain shipments of goods were sold. In the course of evaluating the evidence, the Customs Court correctly observed that

The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise.

but, in view of *Brooks Paper Company* v. *United States*, 40 CCPA 38, CAD 495; *Kobe Import Co.* v. *United States*, 42 CCPA 194, CAD 593; *United States* v. *Fisher Scientific Co.*, 44 CCPA 122, CAD 648, we think, erred in concluding that the Nishiwaki affidavit

* * * was sufficient to overcome the presumption of the correctness of the appraiser's findings and established that merchandise identical with that covered by reappraisement No. 234862-A was being freely offered and sold, in what was then the ordinary course of trade, to all purchasers in the principal markets in Japan for exportation to the United States at $2.85 per dozen, f.o.b. Yokohama, on April 16, 1953

In addition, the court observed that

The Government introduced no evidence to show that any sale was in fact freely made in what was then the ordinary course of trade at any price other than $2.85 per dozen, f.o.b. Yokohama, on April 16, 1953, and thus did not overcome the sworn statement of the manager of Z. Horikoshi & Co., Ltd. *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, T.D. 40731.

The majority of the Customs Court held that the prices referred to in section 402(d) were to be determined on the basis of actual market transactions rather than the prices fixed by MITI, and that the importer had satisfactorily established that the prices at which merchandise such as or similar to that under consideration was freely offered for sale to all purchasers in the principal markets of Japan at the time of exportation were $2.85 per dozen for the first shipment and $2.87 per dozen for the second.

The Government contends the values found by the appraiser should have been accepted by the Customs Court, first, because there is no substantial evidence supporting the prices found by that court, even on the basis of actual transactions in violation of the MITI regulations, and second, because a practice contrary to the laws of Japan is not "in the ordinary course of trade," as contemplated by section 402(d).

In sustaining the importer's valuation of the scarves exported on April 16, 1953 at $2.85 per dozen, the majority of the Customs Court relied on the statement in the Nishiwaki affidavit that "On April 16, 1953, silk scarves identical with those shipped were freely offered for sale and were sold to all persons in Tokyo, Yokohama and Kobe, the principal markets of Japan for the sale of such merchandise for exportation to the United States at $2.85 per dozen F.O.B. Yokohama, and the price did not vary by reason of the quantity purchased."

The quoted statement was made September 30, 1955, more than two years after the events to which it relates, was not supported by any records, and obviously represents merely the conclusions of the affiant. No information is supplied as to the facts on which such conclusions were based, nor does the witness identify a single actual sale or offer for sale on the date in question in any one of the three markets to which he refers. In the *Brooks*, *Kobe*, and *Fisher* cases, cited above, this court held that such statements of conclusions do not constitute substantial evidence sufficient to overcome the valuation fixed by the appraiser, and no reason appears for reaching a different result here. On the contrary, it would appear that the rather complex and somewhat devious nature of commercial transactions in Japan during this particular period, involving, among other things, delayed rebates in Japanese currency, would make it especially important that facts, rather than conclusions, should be established.

In accepting the importer's claimed value of $2.87 per dozen on the scarves exported April 25, 1953, a date not mentioned in the Nishiwaki affidavit, the majority of the Customs Court relied on a showing in one of the Government exhibits indicating that the actual price paid for such scarves, after rebate had been made, was $2.87 per dozen. It is well settled however, that a showing of the actual purchase price of a single sale is not substantial evidence of the price

at which such merchandise was freely offered for sale to *all* purchasers in the principal markets of the country of export. *Sears, Roebuck & Co.* v. *United States*, 31 CCPA 36, CAD 246; *Kobe Import Co.* v. *United States, supra,* and cases there cited.

We think *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, T.D. 40731, relied on by the majority below, is distinguishable in that it did not involve the issues of export value or what constitutes substantial evidence of such value. The issue there was whether a tax was to be presumed to be included in the invoice price. In deciding that question the court stated that the price paid for the merchandise, as shown by the invoice, was *some* evidence of market value, and in the absence of evidence to the contrary, it would be presumed that the sale price included the tax paid at the source. We do not think that decision supports the proposition that an invoice price alone affords sufficient evidence of export value to overrule the appraised value.

The majority of the Customs Court appear to have felt that in view of the evidence submitted, it was incumbent on the Government to prove that the appraiser's valuation was correct. Since, however, no substantial evidence showing error in the appraiser's valuation was presented by the importer, there was no obligation on the part of the Government to offer any evidence.

In view of the above conclusions, it is unnecessary to consider whether export value may properly be predicated on transactions which might be contrary to the law of the country of export.

The judgment appealed from is *reversed.*