(Reap. Dec. 8700)

R. W. SMITH *v.* UNITED STATES
UNITED STATES *v.* R. W. SMITH

Entry No. 2273–H.

(Decided November 20, 1956)

*Stein & Shostak* (*Richard M. Kozinn* and *Marjorie M. Shostak* of counsel) for the importer.

*George Cochran Doub*, Assistant Attorney General (*William J. Vitale*, trial attorney), for the United States.

JOHNSON, Judge: This is an appeal by the importer for reappraisement of 396 pieces of seamless steel oil-well casing of various sizes, threaded and coupled, which were exported from Italy on or about December 6, 1952. Although this case was docketed as a cross-appeal, that was done through error, and the appeal by the Government has been abandoned.

This merchandise was invoiced at $200 per ton, f. o. b. Genoa, and entered at Lit. 144,250 per metric ton, plus 3 per centum Italian sales tax. It was appraised at $275 per metric ton, less freight charges.

At the trial, counsel for the Government agreed to the following offer of stipulation made by counsel for the plaintiff:

I offer to stipulate with counsel for the Government that the value or the price at which such seamless steel API casing of standard quality was sold or freely offered for sale to all purchasers in the principal markets of Italy, in the usual wholesale quantity and in the ordinary course of trade, for export to the United States, on or about the date of exportation herein, December 6, 1952, was $275 per metric ton, f. o. b. Genoa, less inland charges.

I further offer to stipulate that the value or the price at which such seamless steel casing of non-standard quality was sold or freely offered for sale to all purchasers, in the principal market of Italy, in the usual wholesale quantity and in the ordinary course of trade, for export to the United States, on or about the date of exportation herein, December 6, 1952, was $200 per metric ton, less inland charges, and that the value or the price at which such or similar merchandise was freely offered for sale in the usual wholesale quantities and in the ordinary course of trade, in the principal market of Italy, for domestic consumption in Italy, was no higher than said prices at which said non-standard material was freely offered and sold in Italy for export to the United States.

It was further stipulated that 82 pieces of casing, described as 7 pieces, 8⅝″ by 28 pounds per foot; 1 piece, 11¾″ by 38 pounds per foot; 38 pieces, 8⅝″ by 28 pounds per foot; 23 pieces, 9⅝″ by 32.3 pounds per foot; and 13 pieces, 11¾″ by 38 pounds per foot—

* * * consisted of mill over-runs and odd lots of non-standard material which did not meet the specifications for standard API Range 2 casing, and that on or

about December 6, 1952, the date of exportation herein, such casing which did not comply with API standards and consisted of non-standard material, was freely offered for sale and sold in the principal markets of Italy for export to the United States in the usual wholesale quantities and in the ordinary course of trade, to all who cared to purchase, at $200 per metric ton, f. o. b. Genoa, less inland charges.

It was further agreed that the value or price of such merchandise, if sold for domestic consumption in Italy, was no higher.

The issue herein is thus confined to whether or not the balance of the merchandise, 314 pieces of casing, is of standard API (American Petroleum Institute) quality or of nonstandard quality. The point in dispute was further limited, during the course of the trial, by plaintiff's concession that the merchandise was made in compliance with all API specifications, except as to length.

The 314 pieces in question are described on the invoices as follows:

Seamless Steel API Casing, screwed and socketed, with long couplings, made from Grade J–55 Steel. Executed in accordance with API Specs. 5A, 17th Edition January 1952. Pipes oiled outside and all threads well greased. In Range of 11–27 ft. * * * Marked and inspected according to API Specifications:

(8512) O. D. 5.1/2″—Thick. 0.304″

17 lbs/ft. _____ 240

\* \* \* \* \* \* \*

Same tubes as abive [sic] but with short threads and couplings, i. e.:

\* \* \* \* \* \* \*

O. D. 8.5/8″—Thick. 0.400″—

36 lbs: ft.—lengths 11 up to 23 ft. _____ 57

\* \* \* \* \* \* \*

O. D. 9.5/8″—Thick. 0.395″—

40 lbs/ft.—Lengths 11 up to 27 ft. _____ 17

At the trial, plaintiff called Jack L. Foster, an employee of Dalminter, Inc., the American representative of Dalmine S. p. A., seller of the instant merchandise. He stated that he had previously been employed by Charles A. Koons, Inc., the predecessor of Dalminter, Inc., and purchaser of this merchandise. His duties there included handling traffic and insurance, doing liaison work with customs officials, and attending to the general details of importing. He is presently employed as a salesman of oil country tubular goods.

The witness was familiar with the instant merchandise and testified that it was first offered to Charles A. Koons, Inc., at $230 per metric ton, f. o. b. Genoa, and a counteroffer of $200 per metric ton was made and accepted. At the time, his firm was not the exclusive representative of Dalmine, so it was offered to others probably at the same time. The witness believed, though he was not absolutely positive, that it was purchased as standard material, except as to length.

Mr. Foster testified that he was familiar with the API specifications for seamless steel oil-well casings and that such standards are recognized and relied upon by the oil industry in 99½ per centum of the

instances where the material is sold. He was acquainted with the fact that there are standards for lengths of API casings, such as those set forth in table 18 of the API Specification for Casing, Tubing, and Drill Pipe, API STD 5A, 19th edition, March 1954, which was received in evidence as plaintiff's exhibit 2. An earlier edition of the same, dated January 1952, was subsequently introduced in evidence as plaintiff's exhibit 8. These tables show the range of lengths and permissible variations for standard casing. Three ranges of length are given, but, according to the witness, range 2 is almost the only one used. The casing in that range may be from 25 to 34 feet in length; for 95 per centum of a carload thereof, the minimum permissible length is 28 feet, and for 5 per centum, the minimum is 25 feet. In range 1 (16 to 25 feet), the minimum permissible length for 95 per centum of a carload is 18 feet and for 5 per centum, 16 feet.

Mill tally sheets, giving the weight and length of the pieces involved herein, were received in evidence as plaintiff's exhibits 3, 4, and 5. The witness stated that the sheets showed, as to the 240-piece lot, that 24 pieces, or 10 per centum, were under the minimum length permitted for 5 per centum of a carload of range-1 casing and that more than half was under that of range 2. As to the 57-piece lot, 6 pieces, or 10 per centum, were under the minimum permitted for 5 per centum of a carload of range-1 casing and 31 pieces were under that of range 2. As to the 17-piece lot, none was under the permissible length of range 1, but 9 pieces were under that of range 2. In the opinion of the witness, the merchandise covered by the tally sheets would not be acceptable to the trade as a good order of standard API casing.

Mr. Foster described a "string of casing" as enough casing to put in any given well. He said that it takes 8,000 feet of casing to make a string of 5½-inch by 17 pounds per foot casing, whereas the 240 pieces of such casing before the court consists of only 5,300 feet. Although this weight of casing might be used for a 5,300-foot well, it would be very uneconomical, and, in his experience, the oil industry uses the weight and size of casing prescribed for a particular depth of well by API specifications. The other lots of casing involved herein were also insufficient to form strings of casing. According to the witness, it was not the usual practice to purchase casing in amounts which do not constitute a string.

The witness explained the term "mill over-run" as follows: When a mill has an order for a sizeable quantity of tubing or piping, an extra quantity of steel is figured to cover rejections and bad threading. If the number of rejections is small or the run very good, there will be an overproduction. When a mill has an overrun of short-length material in range 1 or smaller, it tries to dispose of it at the best price it can get, which is usually much lower than that for range-2 casing.

In the experience of the witness, merchandise which is standard in all material respects, except as to length, is not as readily salable as that which complies with all API specifications. If the purchaser desires to buy short lengths, the price is higher, but where the seller has an overrun and has to dispose of it, he takes less money.

Mr. Foster testified that the purchase of foreign casing is usually subject to acceptance, after inspection by a recognized inspection agency, such as Moody Engineering Co. That company examined the merchandise involved herein and submitted a report to the purchaser, which was received in evidence as plaintiff's exhibit 6. The agency rejects merchandise, if it is not in accordance with API or purchase order specifications. If the merchandise is ordered in short lengths of API casing, standard in all other respects, the company does not reject the merchandise.

According to the Moody report, a small number of pieces in the total shipment were rejected for shaved threads, seamy steel, pitted steel, and defects ground too deep. The report states:

We beg to report on the inspection of all of the 5½'', 8⅝'', 9⅝'' and 11¾'' short length API casing furnished on your Purchase Order #C–952–141 placed with Dalmine, S. P. A. * * *

 \* \* \* \* \* \* \*

While your original instructions were that any lengths of casing shorter than Range 2 casing were to be spliced into jointers thus producing lengths between 25 ft. and 34 ft. with not more than one splicing coupling to each jointer, with your permission as expressed in your November 20, 1952 letter only a small number of jointers were furnished on this order and every item was furnished with one or more lengths shorter than 25 ft. * * *

 \* \* \* \* \* \* \*

The length range, average length and weight per foot of each item of casing furnished on this order are as follows:

| Size | Length Range |
|---|---|
| 5½'' x 17#, LT&C | 11' 8'' to 27' 11'', incl. |
| 9⅝'' x 40#, ST&C | 16' 10'' to 27' 11'', " |
| 8⅝'' x 36#, ST&C | 11' 6'' to 27' 11'', " |

It was conceded that all of the casing, except the 82 pieces, heretofore referred to, were die-stamped API. The witness stated that casings of a range length less than that shown in the table might be marked API, where they were part of a large order. He explained, referring to the 5½-inch casing:

When those 240 pieces came off the mill as an over-run, it was probably part of an order of say 24,000 pieces, or 50,000 pieces. Then it was API monogrammed. The short joints then constituted less than 5 per cent of the shipment, and they figured they could make jointers out of those of less than the specified minimum limit.

There was also received in evidence, as plaintiff's exhibit 7, an affidavit of Dr. Ing. Ambrogio Garbagni and Dr. Cesare Rainero, who were vice directors of Dalmine S. p. A., had been associated with said company in 1952, and were familiar with the present merchandise. The affidavit states, in part:

3. That the merchandise covered by said invoice consisted of 396 pieces of threaded and coupled casing of very short lengths; that part of the merchandise was of non-standard wall thickness and did not comply with A. P. I. standards with respect to the weight per foot; that the A. P. I. monogram was not applied to part of the material; and that part of said material did not correspond to A. P. I. standards.

4. That except for 240 pieces 5½″ casing in very short lengths, the remaining material constituting the shipment consisted of small quantities of casing in different sizes and wall thickness resulting from mill over-runs.

5. That the said lot of 396 pieces of casing covered by Invoice 5917 was an odd lot of non-standard lengths of considerably lower value than standard A. P. I. casing range 2.

6. That while first quality standard A. P. I. casing in standard lengths was sold and freely offered for sale in usual wholesale quantities to all purchasers at or about the time of exportation of the merchandise covered by said Invoice 5917, at a price of $275.00 per metric ton, odd-lot, non-standard material such as that covered by Invoice 5917 was sold and freely offered for sale, for export to the United States, on or about the date of exportation of said material from Italy, to wit, on December 6, 1952, at a price of only $200.00 per metric ton.

At the conclusion of the hearing. the Government moved in evidence all the papers in the official file.

Plaintiff claims that the record presented establishes that the casing involved herein consisted of nonstandard material, which, according to the stipulation of counsel, was freely offered and sold to all purchasers in Italy in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, at $200 per metric ton, less inland charges, and which was offered and sold for domestic consumption at no higher prices.

The Government claims that the merchandise is described on the invoice as API casing and that plaintiff is estopped to deny the correctness of the same. However, the invoice also gives the ranges of length of the material and said ranges do not conform to those in the API tables. The invoice alone does not establish whether or not the merchandise was standard API casing, nor does it act to estop either party from proving the true character of the merchandise. *United States* v. *Paul Puttmann,* 21 C. C. P. A. (Customs) 135, 138, T. D. 46466; *United States* v. *Rotberg & Krieger,* 24 C. C. P. A. (Customs) 441, 445–6, T. D. 48902.

According to the record, the American Petroleum Institute has established certain standards for steel casing, which are recognized and relied upon by the oil industry. These include certain range lengths with permissible variations. It is clear that the merchandise

involved herein did not fall within any one of the established ranges. Ten per centum of the 240-piece lot was of a length below the minimum of range 1, while the balance fell within either range 1 or range 2. The same is true of the 57-piece lot. The casing in the 17-piece lot fell within either range 1 or range 2. Of the range-1 material in all three lots, more than the permissible 5 per centum measures between 16 and 18 feet in length. In view of the careful grading and minimum permissible lengths of the API range-length tables and the fact that the percentages are per carload, it is evident that mixed lots, such as those involved herein, were not contemplated. While range-1 material may be 16 to 25 feet in length, with only 5 per centum below 18 feet, range 2 may be 25 to 34 feet in length, but no more than 5 per centum may be 25 feet in length. In view of the overlap, it is evident that a carload (or equivalent quantity) was to be in a single range with only the variations permissible for that range. The witness Foster stated that range 2 was the one most used and the Moody report, *supra*, indicates that it was only because of the purchaser's permission that lengths shorter than the minimum length of range 2 (25 feet) were accepted.

The affiants Garbagni and Rainero describe the merchandise as "an odd lot of non-standard lengths" and as "mill over-runs," and the witness Foster said that it would not be acceptable to the trade as standard API casing. In further support of the view that this merchandise was an odd-lot shipment is Foster's testimony that casing is usually bought and sold in sufficient quantity to form a string of casing, but that the amounts herein were not enough for that purpose.

Although the short pieces were marked API, the witness Foster explained that that might happen where such pieces were part of a larger order, as to which they would be less than 5 per centum. The API marking, therefore, does not conclusively establish that the shipment, as imported, consisted of standard API casing.

It was stipulated at the trial that the freely offered price of "seamless steel API casing of standard quality" was $275 per metric ton, less inland charges, and that the price of "such seamless steel casing of non-standard quality" was $200 per metric ton, less inland charges. Defendant claims that, since it was conceded that the instant casing was made in compliance with API specifications, except as to length, it was not entirely of nonstandard quality and, therefore, neither of the stipulated values applied. In view of the very definite specifications made by the API, it cannot be said that merchandise which conforms in some particulars, but not in all or even in one, is API casing of standard quality. Nor is there any evidence in the record that the trade recognized an intermediate grade between standard and nonstandard. The specifications, themselves, permitted certain variations, but merchandise differing any other way, including length,

is nonstandard. A shipment, such as this, consisting of substantial quantities below any permissible length, and the balance in two different range lengths, is, as the affiants state, an odd-lot shipment and cannot be considered standard.

Defendant argues that the fact that this merchandise was first offered at $230 per metric ton is proof that it did not consist of the nonstandard casing referred to in the stipulation of counsel. The fact that the seller tried to get more for the merchandise in this particular instance does not establish that it was of standard or nonstandard quality. The merchandise was actually sold for $200 per metric ton, which, according to the stipulation and the statements in the affidavit of the manufacturer's representatives, was the freely offered price for nonstandard quality steel casing. The record herein does not indicate that prices of nonstandard material were fixed in accordance with the bargaining ability of the parties, but shows that there was a price at which such merchandise was freely offered for sale to all purchasers.

The statements in the affidavit, standing alone, might be found insufficient to prove the prices at which standard and nonstandard merchandise was freely offered for sale to all purchasers in the principal markets of Italy, in the usual wholesale quantities and in the ordinary course of trade, but the affidavit has been supplemented by the stipulation of counsel as to such values. Plaintiff has established, *prima facie*, that the merchandise involved herein is of nonstandard quality. Therefore, its value is, in accordance with the stipulation, $200 per metric ton, less inland charges.

On the record presented, I find as facts:

1. That the merchandise involved herein consists of 396 pieces of seamless steel oil-well casing, exported from Italy on or about December 6, 1952.

2. That such merchandise was invoiced at $200 per ton, f. o. b. Genoa, entered at Lit. 144,250 per metric ton, plus 3 per centum Italian sales tax, and appraised at $275 per metric ton, less freight charges.

3. That the American Petroleum Institute (API) has established certain standards for steel casing, which are recognized and relied upon by the oil industry; that these include three distinct ranges of lengths with permissible variations.

4. That 82 pieces of this merchandise, according to a stipulation of counsel, consisted of mill overruns and odd lots, which did not comply with API specifications for standard API range-2 casing.

5. That the remaining 314 pieces of casing met API standards, except as to length; that, of the 240-piece lot, 24 pieces, or 10 per centum, were under the minimum length permitted for 5 per centum of a carload of range-1 casing and more than half was under that of

range 2; that of the 57-piece lot, 6 pieces, or 10 per centum, were under the minimum permitted for 5 per centum of a carload of range-1 casing and 31 pieces were under that of range 2; and that of the 17-piece lot, none was under the permissible length of range 1, but 9 pieces were under that of range 2; that the shipment consisted of mill overruns and odd lots; that it was seamless steel casing of nonstandard quality.

6. That the value or price at which seamless steel API casing of standard quality was sold or freely offered for sale to all purchasers in the principal markets of Italy, in the usual wholesale quantity and in the ordinary course of trade, for exportation to the United States, on or about the date of exportation herein, December 6, 1952, was $275 per metric ton, f. o. b. Genoa, less inland charges.

7. That the value or price at which seamless steel casing of non-standard quality was sold or freely offered for sale to all purchasers in the principal market of Italy, in the usual wholesale quantity and in the ordinary course of trade, for exportation to the United States, on or about the date of exportation herein, December 6, 1952, was $200 per metric ton, less inland charges.

8. That the foreign values were no higher.

I conclude as a matter of law:

1. That export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for the determination of the value of the seamless steel casing involved herein.

2. That such value is $200 per metric ton, less inland charges.

Judgment will be rendered accordingly.