(Reap. Dec. 10714)

BORDER NOVELTY CO. *v.* UNITED STATES

Entry No. 105–S, etc.

(Decided April 7, 1964)

*Stein & Shostak* (*Marjorie M. Shostak* and *S. Richard Shostak* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Mollie Strum, Alfred A. Taylor, Jr.,* and *Morris Braverman,* trial attorneys), for the defendant.

RICHARDSON, Judge: These appeals for reappraisement, consolidated at the trial, involve silver-plated cigarette lighters, exported from Mexico between September 1 and December 31, 1944, inclusive.

The merchandise was entered at the unit invoice value of 3 pesos each. Appraisement of the entries was suspended from 1944 to 1955, pending the conclusion of foreign investigations pertaining to the value of the lighters. On July 28, 1955, the items entered in September and October 1944 were appraised at 6 pesos each, and those in November and December 1944 at 5.50 pesos each, all plus stamp tax, packing, and containers. In August 1955, notices of appraisement, reflecting these advances, were duly given, and the instant appeals were filed. Thereafter, and following hearings in the case at Laredo in February 1961, New Orleans in October 1961, and Laredo again in February 1962, the untimely demise in May 1963, of Judge Johnson,

to whom the case had been assigned, and the final submission of briefs in August 1963, the case was reassigned and resubmitted to me for decision in September 1963.

Plaintiff claims that the statutory basis of value is the export value, as that value is defined in section 402(d) of the Tariff Act of 1930, and that such value is the invoiced and entered unit value of 3 pesos each, plus stamp tax, packing, and containers. Defendant also contends that export value is the correct basis of valuation of this merchandise, but that such value is the appraised value in each instance. Thus, the issue before the court is the market value or the price, at the time of exportation, at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States.

At the first hearing, Irving Davis, who was a partner in the plaintiff firm, Border Novelty Co., between 1943 and 1945, testified as follows:

In 1944 and 1945, he personally visited Mexico every 6 or 7 weeks on buying trips lasting 3 to 4 weeks. Through various inquiries, he located the manufacturers, Cano y Rodriguez and Cia. Metalica Troqueladora, from whom he purchased silver-plated lighters for Border Novelty Co. These two companies had the same principals and operated at the same location under different names.

The witness stated that he paid 3 pesos each for the lighters; that there was no difference in price depending upon the quantity purchased; and that he did not bargain with the manufacturer over the price. The lighters he secured were not first quality but were ones which had been rejected by or for other purchasers. The manufacturer did not have a written catalog of prices, and, according to the witness, on rejects he could not have had. The witness was told that purchasers of first quality lighters were also paying 3 pesos apiece, but he, Davis, could not get good lighters, because the others had had dealings with the manufacturer first. He accepted the rejects at the same price, because it was war time, and he could not get any other merchandise. He did not agree to buy the whole reject lighter stock of the factory.

The witness spent considerable time in the factory, inspected the lighters bought by others, and observed that the girls who were packing them picked out the better lighters and threw the rejects on a different table. The witness was told he could take the latter. He knew that they had been made for other buyers, because the name of the buyer was engraved on the lighter. He accepted some of them with the name on but in other cases the name was taken off. On certain occasions, Border Novelty Co. used its mark "Bonoco" on the lighters.

Some of the lighters were marked "Dorcel," some "King," and some "Lefco." Those marked "Dorcel" were made for Dorfman and Celaya and those marked "Lefco" for Mr. Leff. The lighters that were packed for Mr. Dorfman and Mr. Leff were in perfect condition.

The witness explained that the rejected lighters were not completely unusable; they were not in such perfect condition as the others, and could be used for a while. However, some did not last even a week. Some of the rejects were not finished smoothly; in some, the mechanism was not properly set in the case, and, in some, the wheels were bad. Some had to be refilled with cotton in the bottom in order to get the proper setting. Some were square and some were oval, but the witness did not think that made any difference in quality or value. He paid the same price for them.

While the witness did not know the names of all the American importers who were buying from this Mexican manufacturer, he mentioned three: Irving Leff of Mexico City, Dorfman and King of the United States. He did not see any cigarette lighters going to any other purchasers, except himself. He did not know whether he was the only one buying rejects, but he did not know anyone else who was.

The witness remained in Mexico until the merchandise was shipped out. It was sent to San Antonio, and he did not see any of it again, except for some items which were returned by American buyers to the firm's office in Laredo. He made out a declaration when the goods were shipped from Mexico, the value being specified on the consular invoice. At some time when he was in the importing business, he had occasion to speak to customs officials in Laredo about the imported cigarette lighters. He did not tell them he was importing only rejects, because he did not talk to them for the purpose of describing the lighters.

Since the witness did not do any selling, he did not know how the lighters were described when they were sold in the United States.

The witness testified that he did not pay any other charges to the Mexican manufacturers for the cigarette lighters. He did not recall whether he paid the costs of packing and containers to the Mexican manufacturer or whether he bought the containers himself. The charges for shipping to the United States were paid here. He shipped the merchandise himself rather than depending upon the Mexican manufacturer to do so.

Mr. Davis stated that each shipment contained an invoice and that the invoices did not state that the merchandise consisted of rejects. The invoice in reappraisement No. 259908–A described the lighters as made of light brass, plated. In the consular invoice which he signed, he did not use the word "reject."

Leon Shapu, another of the partners of Border Novelty Co., testified that he was in charge of the office at Laredo and the finances.

He was familiar with the importations involved herein, but did not see the lighters when they were imported. Neither he nor Davis had anything to do with selling the merchandise in the United States; that was done by his brother. Therefore, he only saw the merchandise which was rejected by customers and which began to come back about 60 days after the firm started selling it. He inspected the lighters and found that some had the bottom out; some had the wheel broken off; and some had the top broken. The merchandise was inexpensive, poorly put together, and not uniform. At first, there were about 25 percent returns when the merchandise was sold at PX's to boys going overseas and, later, up to 50 percent when sales were made to jewelry stores. About 5,000 to 7,000 returned lighters were sold to a scrap iron dealer for $36.

Mr. Davis paid for the merchandise he bought in Mexico in cash; they did not want checks. He made memoranda about his purchases on pieces of paper and then copied them in a book. Mr. Shapu stated that he knew Mr. Davis was paying 3 pesos for the lighters during the entire period, but he did not know what other firms paid. There was very little correspondence because Davis went to Mexico so often.

The witness recalled that, in March 1945, he and his brother, who was also a partner, and Mr. Davis appeared before customs officials and made statements about the imported merchandise. He identified Mr. Davis' signature on one of the statements. The three statements were offered in evidence by counsel for the defendant as collective exhibit A for identification. Counsel for the plaintiff, having objected to the admission of these documents, the court stated that they would not be received for the primary purpose of impeaching the previous witness, Irving Davis, and took the matter under advisement.

Plaintiff then offered in evidence a photostat of an affidavit in Spanish, dated July 11, 1946, by Alfonso Martinez Rico of Compania Metalica Troqueladora, together with a translation into English. This was received in evidence as plaintiff's collective exhibit 2. This document states in part:

1. The statement of account furnished to the Border Novelty Co. of Laredo, Texas through your agent Mr. I. David [sic] and signed by our cashier Mr. Agustin Ricaud dated on February 8, 1945, covers all and every commercial transaction had with such Border Novelty Co.

2. The shipments shown on the statement have been (were) billed by Alfredo Padilla, Cano Rodriquez, S. de R.L. (society of limited liability) Metalica Troqueladora, S. de R.L.

3. The attached copies are true copies taken from the billing books of the above named firms, being bills numbers 150 through 204 from the Cano Rodriquez, S. de R.L. Company, and numbers 1 through 12 from the Cia Metalica Troqueladora S. de R.L. Company.

The reason for the change in numbers is that the Cano Rodriquez, S. de R.L. Company by a notarial writing changed its name to Cia Metalica Troqueladora,

S. de R.L. because such change suited its stockholders (partners). Likewise a number of bills (statements) are unnumbered, which is due to the fact that during the change of name proceeding there was a lapse of time necessary to print new bills and have them approved by the secretary of Revenue during which time we were obliged to continue billing and affixing revenue stamps to our bills as is required by law.

4. That bill #9 which is hereto attached and made out to I. Zapp and Co. of Panama, C.A. billing at $5.00 (five pesos Mexican money) per piece, includes the sale price plus the commission of the intermediary (agent) in the transaction.

\* \* \* \* \* \* \*

6. A large part of the lighters sold to Border Novelty Co. were made by assembling lighter parts from lighters rejected by other buyers, a condition which was accepted (acceptable to) by Border Novelty Co. and they were to accept the lighters regardless of defect or condition of any of their parts, our expense in this behalf being approximately $1.00 (one peso Mexican money) per piece.

\* \* \* \* \* \* \*

Attached to the affidavit is a list of sales numbered 150 through 204, and 1 through 12. No copies of bills are attached, nor is there any list of the unnumbered bills referred to in the affidavit. Sales are listed prior to September 1, 1944, to Antonio Mendez, A. W. King, and Irving Leff at 2.16 pesos per piece, and to Isadore Dorfman, Border Novelty Co., Mex. Handicraft, and E. Reynaud e Hijo at 3 pesos per piece. Subsequent to September 1, 1944, there are listed sales to Isadore Dorfman, Border Novelty Co., Mex. Handicraft, E. Reynaud e Hijo, and Amalia Salzillo at 3 pesos per piece and one to I. Zapp Co. at 5 pesos per piece. Whether this list is the statement of account referred to in the first paragraph of the affidavit is not clear, since it is undated, whereas the statement is said to be dated February 8, 1945. It is evidently a photostat of a copy, since it is unsigned.

Plaintiff then rested and defendant called Leon Shapu as its witness. He identified the statement given by him to customs officials in March 1945 and testified that the answers he gave were correct. He testified that Mr. Davis gave information to customs officials at the same time and identified his (Davis') signature on the statement, which is part of defendant's exhibit A for identification. The witness added that his brother, Michael Shapu, also appeared before customs officials at that time and gave a sworn statement. Counsel for the Government renewed the offer of these statements. Counsel for the plaintiff repeated her objections and the court stated:

JUDGE JOHNSON: The court has permitted counsel for the Government to ask this witness anything she desires to ask. She has asked the questions, and he has answered them. Anything in those documents that is for the purpose of impeaching the witness who was on the stand yesterday, when she evidently had the documents and had an opportunity to cross examine, and she did cross examine for hours, will not be permitted to be received in evidence. \* \* \*

The case was then transferred to New Orleans at the request of counsel for the defendant.

At New Orleans, Benjamin S. White, who had been customs agent at Laredo between November 1943 and January 15, 1952, testified that he had had Mr. Irving Davis come to his office for the purpose of attempting to determine the price at which he and his company had purchased cigarette lighters in Mexico and the conditions under which he purchased them; that Mr. Davis had come and had made a statement, which Mr. White identified as one of those included in defendant's exhibit A for identification. Counsel for the Government renewed its offer of this statement as evidence on the ground that it contradicted Mr. Davis' testimony when on the stand. The court then stated:

JUDGE FORD: For the limited purpose the Court is going to send this case back to Laredo. She will have a chance to get him back, to go to Laredo again.

It will be admitted with the understanding, of course, that this case will be returned to Laredo.

The statement of Mr. Davis was then received in evidence as defendant's exhibit B.

At the subsequent hearing in Laredo, Mr. Davis was unable to be present because of ill health.

At that time, the court ruled on defendant's motion to correct the record of the initial Laredo hearing, granting the motion as to two typographical errors and denying the motion in all other respects.

There were then received into evidence a report, dated August 15, 1944, made by Treasury Representative W. W. Fraser (defendant's collective exhibit C) and a report, dated March 6, 1945, also made by Mr. Fraser (defendant's collective exhibit D).

While defendant's collective exhibit C refers to a time prior to these importations, some of the statements fill in the background on the manufacturer's method of doing business. According to Mr. C. Martinez, the sales manager, on September 1, 1943, his firm had contracted with Snake King, a partnership, consisting of W. A. King, and his sons, of Brownsville, Tex., for 100,000 lighters at 2.16 pesos each. Some time thereafter, the manufacturer realized it could obtain better prices and commenced making different style lighters and selling them to other purchasers without the knowledge of Snake King. Many sales were made of which the firm kept no record. The lighters sold to Snake King were die-stamped "WASK," while those sold to Dorfman were marked "DORCEL." Shortly prior to July 29, 1944, the manufacturer advised Snake King that it could not sell lighters at 2.16 pesos each and that it considered the contract no longer in force. The Treasury representative's report continues:

Martinez said that immediately after notifying the Kings that he had terminated their contract, he began to offer to all purchasers at wholesale such lighters as he had been selling to Snake King at the price of 6.00 pesos each. On August 9, 1944, Mr. Martinez said that he had made no sales of the lighter

at this price because he could find no purchasers willing to pay his asking price. He said that prospective purchasers had advised him they could not pay as much as 6.00 pesos for the lighter because they would then be unable to sell the merchandise in the United States at a profit in view of the O.P.A., price ceiling. Martinez said he supposed he would have to ask less for his merchandise.

Martinez said the three styles of lighters cost him about the same to manufacture and that he was in hopes of getting 5.00 pesos for them if it were not possible to obtain the 6.00 pesos which he was asking.

In defendant's collective exhibit D, Mr. Fraser stated that he visited the offices of Cano y Rodriguez and Cia. Metalica Troqueladora on February 20, 1945. He was told by Mr. C. Martinez that the lighters sold subsequent to his visit of July 29, 1944, had been sold under the same terms and conditions, but he (Fraser) was offered a different set of books than those which he had previously examined. Mr. Florentino Martinez, manager of Cia. Metalica Troqueladora, said that the merchandise had been freely offered to all purchasers for exportation to the United States without restriction as to resale or use and that prices had been subject to bargaining. A list of sales taken from the books of the companies is included in the report and is substantially the same as the list attached to plaintiff's collective exhibit 2. In addition, the report lists sales to Pan-American Trading Co., Max Seligson, and Jorge Rendon, all of Mexico City, at 5, 5.75, 6, and 7 pesos each. The general manager of Pan-American said that 200 of the lighters he purchased were sold to Alltex Co. in New York City on June 26, 1944, at United States $1.75 each, which he said equaled 6.92 pesos each, net, Mexico City.

When questioned about false invoices, Mr. C. Martinez said that, on numerous occasions, they had issued false invoices showing the sales price at a higher figure than the actual sales price, but not at prices less than the actual sales price.

Mr. Martinez also stated that the four types of lighters which his firm manufactured cost approximately the same to the manufacturer, and sales were made at one price, regardless of the type or types of lighters furnished. In filling orders, some of each type were likely to be furnished.

In connection with his previous statement in regard to asking 5 or 6 pesos per lighter, Mr. Martinez said that his old customers demanded lighters at the same prices they had been paying and that, as a result of being bothered by them, he complied with their demands.

Aladar Deutsch, who had been connected with Mexican Handicraft Import Co. or Aladar Deutsch Importing during 1944 and 1945, testified that he had imported cigarette lighters from Mexico purchased from Cano y Rodriguez. He stated that when his first shipment arrived, he told his customs broker that the consular invoice was not

correct and that the price given was lower than the actual purchase price. He attempted to get a correct invoice from the shipper, but was unable to do so. He did not remember either the price at which the purchase order was placed or the price shown in the consular invoice. He vaguely recalled that there was an O.P.A. price and thought he wrote the seller to reduce the price.

The plaintiff then recalled Mr. Leon Shapu, who testified that the invoice in reappraisement No. 259909–A showed the price which Border Novelty Co. actually paid for the merchandise and that the same price was paid throughout the period of these importations.

Mr. Shapu testified that Mr. Davis, in the regular course of business, accounted to Border Novelty Co. for the funds transmitted to him, and that he (Davis) kept a record book. He identified a book, marked plaintiff's exhibit 4 for identification, as the book Davis kept and stated that he had seen it when Mr. Davis showed it to the customs agent in March 1945. Davis kept the book in his briefcase and made notations when he got through a buying trip in Mexico. The book was received in evidence as plaintiff's exhibit 4.

On the record as presented, the only issue before the court is the price at which the merchandise was freely offered for sale to all purchasers for exportation to the United States. The parties have agreed that export value is the proper basis of valuation, and no issue has been raised as to principal market or usual wholesale quantity. The challenging of one item of an appraisement does not destroy the presumption of correctness attaching to all the other items. *United States* v. *Fritzsche Bros., Inc.*, 35 C.C.P.A. 60, C.A.D. 371; *United States* v. *Schroeder & Tremayne, Inc.*, 41 C.C.P.A. 243, C.A.D. 558; *United States* v. *A. N. Deringer, Inc.*, 46 Cust. Ct. 762, A.R.D. 127, appeal dismissed 48 C.C.P.A. 169; *Stockheimer & Harder et al.* v. *United States*, 49 Cust. Ct. 420, Reap. Dec. 10355, rehearing granted, Reap. Dec. 10378.

Plaintiff presented considerable testimony to establish that the lighters purchased by Border Novelty Co. were not of first quality but were rejects. This would have a bearing only if there were a different price for substandard merchandise. *R. W. Smith* v. *United States*, 37 Cust. Ct. 565, Reap. Dec. 8700. Otherwise, damaged or defective merchandise cannot be appraised at a value different from that of regular merchandise. *Kobe Import Co.* v. *United States*, 42 C.C.P.A. 194, C.A.D. 593; *Hoenig Plywood Corp. et al.* v. *United States*, 41 Cust. Ct. 607, A.R.D. 91. In the instant case, plaintiff apparently contends only that reject lighters should not be appraised at a higher value than the price of 3 pesos per lighter at which better quality lighters were offered and sold to other purchasers. (Plaintiff's brief, page 29.)

. The issue, therefore, is at what price, if any, lighters were freely offered to all purchasers by Cano y Rodriguez and Cia. Metalica Troqueladora.

It appears from defendant's collective exhibits C and D that, prior to the time of these importations, the manufacturer had an agreement with the firm known as Snake King for the sale of lighters to it at 2.16 pesos each. Subsequently, the manufacturer found it could get more for such merchandise, and it began to make lighters of a little different size and shape and offered them to others. According to the lists of sales in defendant's exhibits and that attached to plaintiff's collective exhibit 2, sales were made to Dorfman, Border Novelty, and Mexican Handicraft at 3 pesos. Some other sales are also listed, but they were not sales for exportation to the United States.

According to defendant's collective exhibit C, the manufacturer canceled its contract with Snake King about July 29, 1944, and offered lighters such as it had been selling to Snake King to all purchasers at 6 pesos each. However, Mr. Martinez told the Treasury representative that he made no sales at that price, since he could find no purchasers willing to pay it. In defendant's collective exhibit D, there are some sales listed at 5, 5.75, 6, and 7 pesos, but these were sales to purchasers in Mexico City, and only one lot of 200 lighters was sold by such a purchaser to a customer in the United States. This sale was prior to the first date of exportation involved herein. Furthermore, on February 28, 1945, Mr. Martinez stated that his old customers had demanded lighters at the same prices they had been paying and that he had complied with their demands.

The statement that the lighters were freely offered to all purchasers at 6 pesos at some time in July or August 1944, unsupported by evidence of sales, is a mere conclusion and is insufficient to establish that price as the market value under the terms of the statute. *Brooks Paper Company* v. *United States*, 40 C.C.P.A. 38, C.A.D. 495; *United States* v. *Baar & Beards, Inc.*, 46 C.C.P.A. 92, C.A.D. 705; *Kobe Import Co.* v. *United States*, 42 C.C.P.A. 194, C.A.D. 593. In fact, Mr. Martinez' statement and the lists of sales indicate that no sales for exportation were made at 6 pesos per lighter during the period involved herein, September through December 1944.

The lists of sales in defendant's collective exhibit D and plaintiff's collective exhibit 2 show sales for exportation to the United States, during the period involved herein, to Dorfman, Border Novelty, and Mexican Handicraft at 3 pesos. Sales were also made to some purchasers in Mexico City at 3 pesos. Mr. Davis' book (plaintiff's exhibit 4) shows additional sales to Border Novelty at 3 pesos each.

Defendant claims that this evidence is insufficient to establish a free offering to all purchasers at 3 pesos, because the lists do not account for all the sales actually made and because other evidence

raises a question as to the veracity of the statements made by the manufacturers:

a. According to defendant's collective exhibit C, Mr. C. Martinez stated that his firm made many sales of which no record was kept. This exhibit refers to a time prior to the dates of exportation involved herein. Whether or not this practice continued, is not clear from the record. Mr. F. Martinez, manager and part owner of Cia. Metalica Troqueladora, stated to the Treasury representative, on February 20, 1945, that all sales made by his firm were listed in the ledger. Whether the sales not included in the lists of sales were made by Cano y Rodriguez or Cia. Metalica Troqueladora does not appear.

b. Certain sales to Pan-American are listed in defendant's exhibit C, but not in the other lists of sales. However, these sales were not for exportation to the United States, occurred prior to the dates of exportation involved herein, and were apparently listed under export value to show that certain restrictions on resale existed at the time.

c. There are discrepancies between the sales listed in defendant's collective exhibit C, plaintiff's collective exhibit 2, and defendant's collective exhibit D. This may be partially due to the fact that, in some cases, the dates of the orders are used and, in others, dates of exportation. It also appears, from plaintiff's exhibit 4, that deposits sometimes were made for large quantities, but shipments were made in smaller quantities at subsequent dates. For instance, on April 27, 1944, a deposit of 4,000 pesos was made for 4,000 lighters. On June 5, a balance was paid for 1,008 lighters and, on June 13, for 1,000 more. On June 26, 1944, a deposit of 7,000 pesos was made for 7,000 lighters. A balance was paid on July 31, for 2,000 lighters, on August 22, for 1,000 lighters, on September 14, for 1,000 lighters, on October 2, for 2,000 lighters, and on October 3, for 1,000 lighters.

Although the affidavit of Alfonso Martinez Rico (plaintiff's collective exhibit 2) states that the statement of account covers all transactions with Border Novelty Co., it points out that some bills were unnumbered, because of the change of name proceeding. These unnumbered bills are not included in the list, nor are other transactions listed in plaintiff's exhibit 4.

d. Defendant criticizes plaintiff's list because it does not include all sales to Snake King, but it does not purport to do so. The affidavit states that it is a list of all transactions with Border Novelty Co. There is a list of sales to Snake King in defendant's collective exhibit C, but the dates of sale are not given. They may have occurred prior to the first date in the list of sales in defendant's collective exhibit D and in plaintiff's collective exhibit 2, since Snake King's contract is dated September 1, 1943, and the list begins November 4, 1943.

e. The sales to Dorfman listed in defendant's collective exhibit C cover 5 sales in a total quantity of 3,900 lighters, while those listed

in defendant's collective exhibit D cover 2 sales during the same period in a total quantity of 5,000.

There is no positive statement in the record that this merchandise was freely offered to all purchasers for exportation to the United States at 3 pesos each, but the evidentiary facts show sales to at least three purchasers at 3 pesos each. The situation is, therefore, opposite to one where there is a conclusion but no evidentiary facts. *Brooks Paper Company* v. *United States, supra; United States* v. *Baar & Beards, Inc., supra; Kobe Import Co.* v. *United States, supra.* In such cases, it has been held that the conclusion is not sufficient proof in the absence of supporting evidentiary facts.

The situation here is analogous to that in *William J. Oberle, Inc.* v. *United States*, 16 Cust. Ct. 336, Reap. Dec. 6265. Affidavits stated that the merchandise was freely offered to all purchasers for exportation at 30 cents per pound, but there was no evidence of actual sales at that price. Treasury reports listed sales at other prices. The court stated (p. 338):

* * * Inasmuch as these prices are based upon actual sales as disclosed by the seller's books, they would prevail as against the opinions expressed in the affidavits based on offers for sale only, without the corroborating evidence of names and addresses of purchasers or prospective purchasers, or the quantities in which the offers were made.

See also *Jenkins Brothers* v. *United States*, 25 CCPA 90, T.D. 49093, where the court held that a statement as to a usual wholesale quantity could be given no weight as a statement of fact when all the facts upon which the statement was made were disclosed.

Although none of the lists of sales is complete in itself and although Mr. Davis did not state positively that he knew of all the purchasers of this merchandise, he did not see lighters going to anyone other than Dorfman, King, Leff, and himself during the time he was at the factory. The only other purchaser for export that the record discloses is Mexican Handicraft.

Although there are discrepancies in the record as to dates of sale and quantities sold, the price on sales for exportation was 3 pesos per lighter, except to Snake King, during the period of the agreement between that firm and the manufacturer. The evidentiary facts presented establish *prima facie* that lighters manufactured by Cano y Rodriguez and Cia. Metalica Troqueladora were freely offered for sale to all who cared to buy for exportation to the United States during the period involved herein at 3 pesos each. The record does not show any sales for exportation to the United States at the appraised values of 6 pesos or 5.50 pesos per lighter.

There is evidence of false invoicing, but whether at higher or lower prices than the actual sales price has not been established. Mr. Aladar Deutsch of Mexican Handicraft testified that he had received

a false invoice, giving a lower price than he actually paid, but Mr. Martinez told the Treasury representative that any false invoices they had issued were at prices higher than the actual sales price.

Defendant's exhibit B, which was received in evidence for the purpose of impeaching the witness Davis, corroborates rather than discredits his testimony. For instance, Mr. Davis stated that, at first, Mr. Martinez would not sell him lighters, apparently because of an exclusive agreement. He got around that by changing the form of the lighters and made sales to Davis at 3 pesos per lighter, which price was supposed to be confidential. Later, Davis found that others were buying at a less price. When asked whether 3 pesos was a freely offered price, he said he thought he paid more than anyone except Dorfman; that Dorfman paid the same price, but, since Dorfman was going to buy half a million lighters, they gave him a better finished lighter. He said Dorfman had his pick and Davis had to take whatever came out; as long as the wheel worked and the outside looked all right, he had to take it. Davis stated that he received funds from Shapu with which to pay for the merchandise and other expenses and that he accounted to him for the amounts spent. He took delivery of the merchandise at the factory and supplied the boxes and arranged and paid for the packing himself. He kept a record book in his briefcase and made entries in it every week from slips of paper on which he noted his expenses.

On the record presented, I find as facts:

1. That the merchandise at bar consists of brass cigarette lighters, silver-plated, manufactured by Cano y Rodriguez, S. de R. L., and its successor, Cia. Metalica Troqueladora, S. de R. L., of Mexico City, sold to the plaintiff herein, and exported from Mexico during the period from September 1 to December 31, 1944.

2. That Mexico City was the principal market in Mexico for such cigarette lighters, at the time of exportation involved herein, and that the price did not vary according to the quantity sold.

3. That the cigarette lighters at bar were reject quality, rejected by or on behalf of other purchasers in the United States because of defective conditions, such as poor plating, improperly set mechanisms, bad wheels, or made from defective parts of lighters manufactured for other purchasers in the United States, and that plaintiff company had agreed to accept such lighters, regardless of defective parts or conditions.

4. That, at the time of such exportation, brass cigarette lighters, silver-plated, manufactured by Cano y Rodriguez or Cia. Metalica Troqueladora were freely offered and sold in the principal market of Mexico City for exportation to the United States to all purchasers who cared to buy at 3 pesos each, f.o.b. factory, plus Mexican stamp tax, and the cost of containers and packing.

5. That the respective parties hereto are in agreement, as indicated by their statements, filed pursuant to rule 15(d), that the proper basis of appraisement herein is the export value.

I conclude as matters of law:

1. That export value, as that value is defined in section 402(d) of the Tariff Act of 1930, is the proper basis of valuation of the merchandise involved herein.

2. That such value is 3 pesos per lighter, f.o.b. factory, plus Mexican stamp tax, and the cost of containers and packing.

Judgment will be rendered accordingly.